**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| SRC CONSTRUCTION CORP. OF MONROE, | |
| Plaintiff, | Civil No. 10-3461 (RMB/AMD) |
| v. | **OPINION** |
| ATLANTIC CITY HOUSING AUTHORITY, | |
| Defendant. | |

**APPEARANCES:**

HANTMAN & ASSOCIATES
By: Robert J. Hantman, Esq.
358 Fifth Avenue, Suite 1003
New York, New York 10001
    Counsel for Plaintiff SRC Construction Corp. of Monroe

PARKER McCAY P.A.
By: Richard W. Hunt, Esq.; Dana B. Ostrovsky, Esq.
9000 Midlantic Drive, Suite 300
Marlton, New Jersey 08054
    Counsel for Defendant Atlantic City Housing Authority

**BUMB**, District Judge:

THIS MATTER comes before the Court upon Defendant Atlantic City Housing Authority's ("ACHA") Motion to Vacate ("Motion to Vacate")[Dkt. No. 209-18] the Final Arbitration Award dated June 20, 2018 ("Final Award")[Dkt. No. 209-2]. In response, Plaintiff SRC Construction Corp. of Monroe ("SRC") filed (1) a Motion for Sanctions against ACHA and its law firm, Parker McCay P.A. (the "Motion for Sanctions")[Dkt. No. 220], and (2) a Motion to Require the Posting of an Appeal Bond (the "Bond Motion")[Dkt. No. 214]. For the reasons set forth below, ACHA's Motion to Vacate and SRC's Motion for Sanctions will be **DENIED**. SRC's Bond Motion will also be **DENIED**, as it is not ripe.

## I.  <u>BACKGROUND & PROCEDURAL HISTORY</u>

This case involved a dispute arising out of the construction of a 4-story senior living facility in Atlantic City, New Jersey (the "Project"). The first two times that ACHA put construction on the Project up for bid, ACHA determined that even the lowest bids were still too costly. After all proposals came in over budget on the third bid, ACHA proceeded to negotiate with the two lowest bidders. Although SRC's proposal was more expensive than the other competing bidder, ACHA awarded the bid to SRC because "it was believed [that] their approach to the project would be superior." Final Award, at 1-2.

On April 24, 2002, ACHA and SRC entered into an agreement governing work on the Project (the "Contract")[Dkt. No. 209-6]. The Project was to be completed in approximately a year and a half, but took more than eight years to complete. The parties have now spent another eight years in litigation.

On July 8, 2010, the general contractor, SRC, filed the original Complaint against ACHA, Lindemon, Winkelmann, Deupree, Martin, Russell & Associate, P.C. ("Lindemon"), the architect, and Czar Engineering as Defendants. On April 12, 2011, the Court granted Defendant Czar's motion to dismiss because SRC failed to produce an Affidavit of Merit of professional negligence. See Dkt. Nos. 41, 42. On October 24, 2013, the Court dismissed Defendant Lindemon for the same reasons. See Dkt. No. 137. On May 1, 2014, the Court entered the Final Pretrial Order [Dkt. No. 150].

After five years of litigation, with trial scheduled for July 13, 2015, SRC and ACHA agreed to administratively terminate this action on July 6, 2015, merely a week before trial, and proceed to binding arbitration. See Dkt. No. 168. The agreement to arbitrate included the following requirements: that a three-member panel consist of at least one attorney; that the Panel would consider pretrial motions as if it had been the Court; and the arbitration would be "limited to the claims made in the

underlying litigation and as reflected in the pretrial order."
[Dkt. Nos. 174, 175].

Disputes between the parties ensued almost immediately upon the commencement of arbitration, returning the case to this Court for clarification. The Court ruled that the arbitration proceedings were to be governed by the Final Pretrial Order and that the applicability of the so-called "<u>Burt</u> Doctrine"[1] and "<u>Spearin</u> Doctrine"[2] were to be presented to the arbitrators pursuant to the parties' agreement to arbitrate. <u>See</u> Dkt. No. 201, at 5. Eventually, a three-person panel of arbitrators was selected comprising of Andrew Carlowicz, Jr., Esquire, Frank Renda, PE and Vincent Riverso, PE, Esquire (the "Panel"). All three held themselves out to be competent experienced construction law counsel and/or professionals, free of conflict. The parties finally began the arbitration proceedings in the fall of 2017.

## II.  <u>**ARBITRATION AWARD**</u>

After 24 days of arbitration proceedings involving multiple witnesses and extensive exhibits,[3] the Panel issued a 19-page

---

[1] <u>See</u> <u>infra</u> pp. 5-6.

[2] <u>See</u> <u>infra</u> p. 6, note 6.

[3] The proceeding occurred between October 2017 and March 2018, and contained approximately 5,200 transcript pages and 95 exhibits.

opinion, on June 20, 2018, setting forth the basis for a final award in favor of SRC in the amount of $2,294,074.85.

The Final Award summed up the terms of the Project as follows:

> The construction cost [of the Project] was primarily funded by the U.S. Department of Housing and Urban Development ("HUD"). The parties executed the contract on April 24, 2002 [(the "Contract")]. The notice to proceed date was May 24, 2002, and the project required substantial completion within 600 days and final completion within 630 days. Ultimately, ACHA terminated SRC on April 30, 2009; nearly 7 years after the notice to proceed date. A performance bond had been issued by Travelers who took over the project and retained a replacement contractor, AJS Contracting ("AJS"). The completion of the project ultimately achieved substantial completion in the fall of 2011; two and one half years after termination despite the fact that the Project was 98% complete at termination.

Final Award, at 2.

As the Panel observed: "It was clear during the hearings that even to this date the parties never agreed where the line of demarcation rested with respect to the design responsibilities for this aspect of the work between the architect/engineer ("AE") design team on the one hand, versus SRC on the other hand." Id.[4]

---

[4] As set forth supra p. 3, the architect and engineering design firm were dismissed due to the failure of SRC to serve and affidavit of merit.

The Panel further noted that the arbitration "had two somewhat unusual wrinkles as well." Final Award, at 3. Those wrinkles were, first, that both parties agreed to be bound by the Final Pretrial Order in this case. Second, ACHA asserted that it would be entitled to a credit or set off pursuant to Burt v. West Jersey health Systems, 339 N.J. Super 297 (App. Div. 2001) for any damages proximately caused by the proven malpractice of the architect team. SRC opposed ACHA's position and argued that irrespective of Burt, the so-called "Spearin doctrine"[5] allowed SRC to seek damages proximately caused by the malpractice of the architectural team directly from ACHA. The Panel resolved the latter dispute in a ruling on August 22, 2017, that any damages proven to have been suffered by SRC which were caused by the professional malpractice of the architect or engineering consultant would be reduced from the overall damages awarded to SRC in its claim against ACHA.

---

[5] In United States v. Spearin, 248 U.S. 132 (1918), the Supreme Court held that a contractor, bound to build a structure according to design specifications provided by the owner, will not be held liable for defects in that design. Id. at 136. The Court explained that by prescribing the character, dimensions and location of the work to be done, the owner "imported a warranty that, if the specifications were complied with, the [work] would be adequate." See Rhone Poulenc Rorer Pharms., Inc. v. Newman Glass Works, 112 F.3d 695, 697 (3d Cir. 1997)(citing Spearin, 248 U.S. at 137). Further, this implied warranty "is not overcome by general clauses requiring the contractor to visit the site, review plans, or to assume responsibility for the work until completion and acceptance." Rhone Poulenc, 112 F.3d at 697(citing Spearin, 248 U.S. at 137).

## III. **LEGAL STANDARD**

Pursuant to 9 U.S.C. § 9, after an arbitration award is entered, the Court must judicially enforce the award "unless the award is vacated, modified, or corrected." Hall St. Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 587 (2008). "There is a strong presumption under the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 et seq., in favor of enforcing arbitration awards." Brentwood Med. Assocs. v. United Mine Workers of Am., 396 F.3d 237, 241 (3d Cir. 2005)(citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983)); see also Hamilton Park Health Care Ctr. Ltd. v. 1199 SEIU United Healthcare Workers E., 817 F.3d 857, 861 (3d Cir. 2016).

A court's review is exceedingly narrow, and a district court should vacate arbitration awards "only in the rarest case[s]." Newark Morning Ledger Co. v. Newark Typographical Union Local 103, 797 F.2d 162, 165 (3d Cir. 1986). The moving party bears the high burden of proving that the arbitration award should be vacated. Handley v. Chase Bank, 387 Fed. Appx. 166, 168 (3d Cir. 2010)(citing Dluhos v. Strasberg, 321 F.3d 365, 370 (3d Cir. 2003))("The party seeking to overturn an award bears a heavy burden as these are 'exceedingly narrow circumstances'").

What this Court cannot do is to vacate an arbitration award merely to correct factual or legal errors.  See <u>Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs</u>, 357 F.3d 272, 279 (3d Cir. 2004).  There is a strongly federal policy in favor of commercial arbitration, and, thus, this Court begins its review with the presumption that the award is enforceable. <u>Freeman v. Pittsburgh Glass Works, LLC</u>, 709 F.3d 240, 251 (3d Cir. 2013).

Pursuant to 9 U.S.C. § 10(a), there are four grounds upon which an arbitration award may be vacated:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

In addition to the four statutory bases for vacating an arbitration award, there are three common law grounds for vacatur: 1) an arbitrator's manifest disregard for the law, as opposed to a legal error; 2) if the award is completely

8

irrational; and 3) if the award is contrary to public policy.

See Dluhos v. Strasberg, 321 F.3d 365, 369 (3d Cir. 2003).[6]

ACHA contends that the arbitrators acted in manifest disregard

of the law. As set forth above, the standard of review is a

deferential one. See Sutter v. Oxford Health Plans LLC, 675 F.3d

215, 219 (3d Cir. 2012), as amended (Apr. 4, 2012), aff'd, 569

U.S. 564 (2013). If the arbitrators make "a good faith attempt

to [interpret and enforce the contract], even serious errors of

law or fact will not subject [the] award to vacatur." Id. at

220.

## IV.  ACHA'S MOTION TO VACATE THE ARBITRATION AWARD

In seeking to vacate the arbitration award, ACHA asserts

one statutory ground for relief, "evident partiality" and a

common law ground for relief, "manifest disregard for the law."

With respect to the latter, ACHA contends that the Panel

exceeded its powers and manifestly disregarded the law regarding

three claims: (1) liquidated damages clause of the contract; (2)

the Travelers damages; and (3) the Burt credit.

### A. "Manifest Disregard for the Law"

The Court first addresses the "manifest disregard for the

law" arguments set forth by ACHA.

---

[6] This Court will assume that these grounds for vacatur survive
Hall St. Associates, LLC v. Mattel, Inc., 552 U.S. 576 (2008).

### 1. Liquidated Damages Clause

ACHA's first contention is that the arbitrators refused to apply the law or ignored the law with respect to the liquidated damages clause of the Contract, imposing the Panel's own brand of "industrial justice." ACHA also argues that, procedurally, the Panel incorrectly shifted the burden of proof to ACHA. This Court disagrees with both contentions.

The Contract contained the following:

(c) If the Contractor fails to complete the work within the time specified in the contract, or any extension, as specified in the clause entitled Default of this contract, the Contractor shall pay to [ACHA] as liquidated damages the sum of [$1,000] for each day of delay . . . To the extent that the Contractor's delay or nonperformance is excused under another clause in this contract, liquidated damages shall not be due [to ACHA]. The Contractor remains liable for damages caused other than by delay.

(d) If [ACHA] terminates [SRC]'s right to proceed, the resulting damage will consist of liquidated damages until such reasonable time as may be required for final completion of the work together with any increased costs occasioned the [ACHA] in completing the work.

See Ex. E [Dkt. No. 209-6] to Certification of Richard W. Hunt, Esq. ("Hunt Cert.")[Dkt. No. 209], at 6.

As ACHA correctly notes, liquidated damage clauses in contracts serve a valuable purpose. Generally, liquidated damage clauses are included in construction contracts as a "predetermined assessment of compensatory damages for failure to substantially complete the construction project within the

contract time." See Perini Corp. v. Greate Bay Hotel & Casino, Inc., 129 N.J. 479, 499 (1992)(abrogated on other grounds by Tretina Printing, Inc. v. Fitzpatrick & Assocs., Inc., 135 N.J. 349(1994)). ACHA contends that the Panel completely disregarded the plain language of the Contract in declining to enforce the liquidated damage clause against SRC. The Court does not agree.

As acknowledged by the Panel, the plain language of the Contract called for $1,000 per day in liquidated damages up until "such reasonable time as may be required for final completion." Based on this provision, ACHA argued that SRC was liable to ACHA for $2,767,000 in liquidated damages to the date of completion, September 13, 2011, or liquidated damages in the amount of $1,901,000 due to delays through the date of SRC's termination. The Panel disagreed.

After considering the testimony and evidence presented at arbitration, the Panel rejected ACHA's argument that liquidated damages should run until the replacement contractor achieved substantial completion. See Final Award, at 4. First, the Panel ruled that the replacement contractor's scope of work was "significantly expanded," a finding that ACHA does not appear to dispute. Second, based on testimony from one of ACHA's own witnesses, that SRC had completed 98% of the work contemplated under the Contract at the time SRC was terminated, the Panel

found that SRC had achieved substantial completion under the
Contract.

The Panel's finding that SRC had achieved substantial
completion under the Contract is especially significant, because
"courts have consistently recognized that delay or liquidated
damages may not be awarded after substantial completion." Perini
Corp., 129 N.J. at 552. In this regard, the Panel relied upon
the testimony of ACHA's architect, Lindemon, who testified that
the Project was 98% completed by SRC as of the date of
termination.

> ARBITRATOR CARLOWICZ: So, would it be fair to say
> that in the September '08 through January '09
> time frame that SRC was in the 97, 98 percent
> range done?
>
> THE WITNESS: Yes
>
> ARBITRATOR CARLOWICZ: Okay.

See Ex. I to Certification of Robert Hantman, Esq. ("Hantman
Cert.")[Dkt. No. 213-1], at 82, Tr. 4122. This testimony, along
with the architect's two punch lists from 2009, provided the
basis for the Panel's finding that "at some point in early 2009,
SRC essentially achieved substantial completion, and liquidated
damages cannot be sought thereafter." Final Award, at 4.

The Panel also declined to impose liquidated damages
against SRC for the delays prior to termination, finding that
these construction delays were attributable to both SRC and

ACHA.  Specifically, the Panel found that it was "an incredibly poorly run project on all sides" and that "the early delays were beyond the control of SRC." Final Award, at 3.  The Panel acknowledged that SRC shared fault for the delays, noting that "after making some progress – SRC's progress eventually slowed to a halt." Id.  However, the Panel found ACHA's argument that all the delay was caused by SRC as "untenable." Id. at 6.

ACHA contends that the Panel demonstrated a "manifest disregard for the law" by ignoring the language of paragraph 33(c) and improperly shifted the burden of proof to ACHA in proving liquidated damages.  ACHA correctly notes that liquidated damages clauses are presumptively reasonable, and that the burden of production and of persuasion rests on the party challenging the provision.  See Wasserman's Inc. v. Township of Middletown, 137 N.J. 238, 253 (1994).  However, the Supreme Court of New Jersey has held that "liquidated damages are enforceable only if 'the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach.'" Id. at 253 (quoting Westmount Country Club v. Kameny, 82 N.J. Super. 200, 205 (1964)).

ACHA's argument that the arbitrators improperly shifted the burden of proof lacks merit.  Although ACHA implies otherwise, the Panel never stated that ACHA had a burden to prove that the liquidated damages clause was reasonable.  Rather, the Panel

found that ACHA provided insufficient evidence to apply the liquidated damages clause under the circumstances.  To this end, the Panel stated that "ACHA must prove that a certain number of days of delay were caused by SRC thereby entitling it to liquidated damages." Final Award, at 6.  Finding that ACHA and its witnesses failed to "prove the number of days of delay to support this claim" and "undertook no type of specific delay analysis," the Panel concluded that ACHA had failed to meet its baseline burden of establishing damages.

Likewise, SRC was also unable to "produce specificity with respect to the number of days of delay that were caused by varying circumstances or causes on the project... but did introduce into evidence multiple project letters that did attempt to contemporaneously quantify and identify certain aspects of the project delays." Final Award, at 7.  Because the parties failed to delineate the specific number of days of delay that each party was responsible for, the Panel denied both ACHA's and SRC's delay claims.

On this record, the Court cannot find a manifest disregard of the law, much less a dispensation of "industrial justice" as ACHA contends.  It is clear that the Panel appropriately evaluated the liquidated damages clause under New Jersey state law.  Even if this Court were convinced (which it is not) that a serious error was committed, the Panel's interpretation of

paragraph 33(c) drew directly from the Contract and would not amount to the Panel dispensing its own brand of "industrial justice."  See NF&M Corp. v. United Steelworkers of America, 524 F.2d 756, 759 (3d Cir. 1975)("if an arbitrator is even arguably construing or applying the Contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision.  It is only when the arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice that his decision may be unenforceable.  When... no dishonestly is alleged, the arbitrator's improvident... factfinding does not provide a basis for a reviewing court to refuse to enforce the award"); see also Patten v. Signator Inc. Agency, Inc., 441 F.3d 230, 234 (4th Cir. 2006).  While this Court would have preferred if the arbitrators had provided more extensive findings as to SRC's "refusal or failure to complete the work" under the Contract, the Court does not find that the arbitrators rendered a decision with manifest disregard of the law.

### 2. Travelers Award

After ACHA terminated SRC, ACHA notified SRC's surety, Travelers Casualty and Surety Company of America ("Travelers")

15

pursuant to Section 32(a) of the Contract which provides, in relevant part:

> 32. Default
> The Contractor and its sureties shall be liable for any damage to the [ACHA] resulting from the Contractor's refusal or failure to complete the work within the specified time, whether or not the Contractor's right to proceed with the work is terminated.  This liability includes any increased costs incurred by the [ACHA] in completing the work.

See Ex. E [Dkt. No. 209-6] to Hunt Cert., at 7.  Travelers thereafter retained AJS Construction to complete the Project. Michael Caridi, the principal of SRC, personally guaranteed to indemnify Travelers should it have to make good on its surety bond.  See Ex. G [Dkt. No. 209-8] to Hunt Cert., at 24, 27-28.

As set forth in ACHA's moving brief, Travelers paid AJS to complete the Project pursuant to its obligation under the bond, but it then turned to Caridi for reimbursement pursuant to his guarantee.  Travelers was forced to institute litigation against Caridi, Travelers Casualty and Surety Co. of America v. SRC Construction Corp. of Monroe, 41 Misc. 3.d 1232(A) (NYS Nov. 1, 2013).  Travelers settled this litigation for $1.1 million.

The Panel awarded $1,035,000 to SRC (the amount paid on the Travelers bond less SRC's concession of $65,000) because it found that ACHA had not secured the building ("Had ACHA secured the building, this cost to Travelers which then passed along to SRC, would not have been incurred"). Final Award, at 15.

In essence, ACHA argues that the Arbitration Panel exceeded its powers in assessing these consequential damages to ACHA. More specifically, ACHA argues that it was not contemplated under the contract that ACHA would be obligated to reimburse Caridi for his obligation to Travelers. But, as explained below, ACHA misses the point of the Panel's ruling, which is that the Panel found that the payment Caridi settled for was for monies Travelers was forced to expend, not because of SRC's failure to perform, but because of ACHA's negligence. "The evidence demonstrated that the reason Travelers paid as much as it did to complete this project was not caused by the failure of SRC to complete the project." Final Award, at 13.

The Panel noted that, usually, when a replacement contractor (such as AJS) takes over work on an existing project, the cost to complete the remaining work will cost more than the remaining balance on the original contract. The Panel, however, found that this case went far beyond the "usual" case. Final Award, at 13. The Panel explained:

> It is certainly not unusual when a contractor is terminated and the surety takes over the project to see a scenario in which the cost to complete the work by a replacement contractor (who is completely new to the project) costs more than the remaining contract balance. Here, the evidence presented to the panel demonstrated that something else occurred.

Payment application #46, which was certified to by the Architect on September 8, 2008, demonstrated that 97% of the project was completed.  The balance to finish and retainage collectively equaled $714,942.10.  This ran through September 2, 2008 which was 8 months prior to termination.  While SRC did not complete a great deal of work over the next 8 months, Tom Hannon from ACHA testified that after termination he was of the opinion that with a full crew the project could be completed in 6 to 8 weeks.  He estimated that the project was 98% complete by that time.

Even if change orders totaling $850,000.00 had been granted on this project; thus bringing the adjusted contract amount up to approximately $6,650,000.00, 2% would still only equal $133,000.00.  Looked at another way, this project was to achieve final completion in 100 weeks.  Mr. Hannon, who walked the site and was a knowledgeable witness, opined that as of termination it would take no more than 8 weeks to finish the work with a full crew.  That would represent 8% of all of the time allotted for the project; including punchlist work.  Again, if the adjusted contract amount had been increased to $6,650,000.00, 8% would still only calculate out to a balance to finish including retainage of $532,000.00.  If the median figure between these two figures was used, the monetary value of the work to be completed as of termination, according to ACHA's own payment certified applications and witnesses, would equal $332,500.00.

The tender agreement between ACHA and Travelers dated September 28, 2010 indicates an adjusted contract balance of $489,397.08.  The contractor completion price is listed as $1,109,000.00, and after a reduction for mold remediation, the contract short-fall would be $694,602.92.  Exhibit ACHA 31 demonstrated that 4 change orders were paid to AJS in the collective amount of $279,314.00.  When added to the above-referenced short-fall, one arrives at the total amount that Travelers had to pay out to complete the project above and beyond the available contract balance, i.e., $973,916.92.  Presumably the additional monies paid by Travelers that brought this figure to $1.1 million or more would have been administrative-type costs.

The post-termination timeline and the testimony of the
Architect are important. Termination occurred in
April 2009. The tender agreement was not entered into
for more than a year and a half. There is no question
that after termination ACHA took over control of the
building. While there were unconvincing efforts to
try to explain this away, the simple fact of the
matter is that the preliminary punchlists issued by
the Architect on the project, which were dated January
2009 and February 2009, were 5 and 6 pages
respectively. This would seem consistent with the
fact that ACHA concedes that SRC completed 98% of the
project by the time of the termination.

AJS, on the other hand, had to work off the Vertex
punchlist. The one presented to the Panel was printed
on August 5, 2010 and it was in excess of 90 pages.
Testimony was proffered that the inspections by Vertex
took place in the summer of 2010. Exhibit ACHA 26 is
an August 2010 letter from Lindemon to Vertex
referencing Mr. Lindemon's review of the scope of
work/punchlist. Thus, one needs to know why there was
such tremendous disparity between the scope of work
that needed to be done in February 2009 when the
Lindemon punchlist was issued, as opposed to, 18
months later when the Vertex punchlist was issued.

The unrebutted testimony came from Mr. Lindemon who
acknowledged that <u>security was lacking at the building
and there was vandalism, e.g., broken windows. For a
building to sit for 18 months in an insecure manner,
and no longer weather tight, will assuredly change the
scope of work needed to complete the project.</u> While
the evidence offered with respect to the change of the
condition of the building was not overwhelming,
comparing the two different punchlists, coupled with
the testimony of Mr. Lindemon, leads to this
conclusion. Moreover, no credible contrary evidence
was even offered.

Final Award, at 13-15 (emphasis added).

The Panel further explained the rationale:

Of course, Travelers was bound to pay to complete the
project, but the actual "proximate" cause of the need
for Travelers to have paid so much more than the

19

remaining contract balance on a project that was 98%
complete <u>was not due to failings on the part of SRC.
It was due to the failure to secure the building by
ACHA.</u>

<u>Had Travelers successfully declined to make this
excess payment, it is clear that this is a cost that
ACHA would have had to incur.  Had ACHA secured the
building, this cost to Travelers which then passed
along to SRC, would not have been incurred.</u>  However,
in their closing submission SRC conceded the
legitimacy of the $65,000.00 set off for latent
defects as referenced in Exhibit SRC85.  Thus, this
claim is awarded in the amount of $1,035,000.00

A few closing comments are needed.  ACHA argued that
the settlement between SRC/Caridi and Travelers that
resulted in payment of $1.1 million was voluntary, and
thus, cannot be passed along to ACHA as a damages
claim.  The Panel disagrees.  From the evidence
presented it appears as though the settlement was
merely an effort on the part of SRC/Caridi to enter
into a payment plan over time while at the same time
securing the right of SRC/Caridi to pay less should
its recovery via this arbitration be below a certain
threshold.  At the end of the day, this is really not
a windfall to SRC/Caridi because the money recovered
for this claim is all being paid to Travelers.  <u>The
net result of this award is simply that ACHA is
responsible to pay the substantial excess amount of
money to complete project post-termination wherein the
terminated contractor had achieved 98% completion, but
then the building was left unsecured, and it certainly
appears as though this resulted in a substantial
expansion of the type and/or amount of work needed to
be completed in order to render the facility
operational.</u>

<u>Id.</u> at 14-15. (emphasis added)

ACHA contends that it is "incomprehensible" that it should

be responsible to pay for damages that arose out of an event

that it contractually required SRC to insure against.  ACHA's

argument, however, deliberately ignores the Panel's key

findings.  Significantly, the Panel found that the Project was 98% complete ("SRC essentially achieved substantial completion") when ACHA terminated SRC and it was ACHA's own negligence that caused excessive costs in the takeover of the Project by AJS. The arbitrators' finding that the Project was 98% complete at the time of SRC's termination was supported by the record and ACHA's own witness's testimony.  The Panel found that ACHA was at fault for the additional costs incurred by AJS in completing the Project.  It is not for this Court to correct the Panel's fact findings that are fairly within a reasonable interpretation of the Contract language.

A surety functions as a security mechanism for the owner, giving it the right to seek satisfaction from more than one person and incidentally reducing the risk of default. See, e.g., Meadowbrook Carting Co. v. Borough of Island Heights, 138 N.J. 307 (1994); see also Albanese v. Machetto, 7 N.J. Super. 188, 191 (App. Div. 1950)(same).  As explained by the New Jersey Supreme Court, a "[s]uretyship is invariably a tripartite relationship in which the obligation of the surety is intended to supplement an obligation of the principal (also described as the debtor or obligor) owed to the creditor (also described as the obligee)."  Langeveld v. L.R.Z.H. Corp., 74 N.J. 45, 49-50, n.2 (1977) (alterations in original).  Thus, there are three parties to a suretyship contract: (1) "an obligee who is owed a

debt or duty;" (2) "a primary obligor, who is responsible for the payment of the debt or performance of the duty;" "and [(3)] a secondary obligor, or surety, who agrees to answer for the primary obligor's debt or duty." Cruz-Mendez v. ISU/Ins. Servs., 156 N.J. 556, 568 (1999)(alteration in original). A surety, however, should not be an opportunity for the owner to run up costs, needlessly or negligently, and pass them on to the surety. That is essentially what the Panel found.

ACHA contends that there "would be no purpose for the Owner (and the law) to require the Contractor to obtain a surety if the Owner were eventually forced to pay for damages arising out of the situation that the Owner, and the law, specifically required a surety to insure against." Motion to Vacate, at 24. As a general principle, ACHA is correct. But obtaining a surety should not result in a windfall to the owner for its own negligence. Indeed, a parties' "own negligence may be considered in allocating liability among the parties." See Cruz-Mendez, 156 N.J. at 576. The Panel found that ACHA incurred extra costs because it changed the Project and failed to protect the site. Significantly, the Panel found that "the actual 'proximate' of the need for Travelers to have paid so much more than the remaining contract balance on a project that was 98% complete was not due to failings on the part of SRC. It was due

to the failure to secure the building by ACHA." Final Award, at
15.

In considering the parties' contributory negligence towards
the cost overruns, the Panel acted within its authority, and it
did not manifestly disregard the law.  Therefore, this Court
cannot disturb the Panel's finding that SRC was not responsible
for the costs incurred by ACHA after being terminated from a 98%
complete project.

### 3. The "Burt" Credit

On April 12, 2011, and October 24, 2013, the Honorable
Joseph E. Irenas ruled that "any recovery SRC Construction
obtains against Lindemon [the Architect] and the Housing
Authority ACHA] will be reduced by the percentage of fault
allocated to Czar [the Engineer]."  See Dkt. No. 41, p.12 n.8.
Consistent with Judge Irenas' ruling, the Panel agreed "that any
damages suffered by SRC which are as a result of the malpractice
of the professionals, Lindemon or Czar, shall be reduced from
the overall damages proven by SRC in its claim against ACHA."
See Ex. I [Dkt. No. 209-10] to Hunt Cert., at 20-22.

Specifically, the Panel held that it had no "competent
evidence upon which to calculate a credit or set off based upon
the Burt case." Final Award, at 11.  As the Panel correctly
noted, in order to prove a claim of architectural or engineering

malpractice, the party with the burden of proof must offer expert witness testimony to show that there was a "deviation from the professional standard of care applicable to that specific profession." Nuveen Mun. Tr. v. Withumsmith Brown P.C., 752 F.3d 600, 605 (3d Cir. 2014)(citing Couri v. Gardner, 173 N.J. 328, 340-341 (2002)). Yet, as the Panel points out – and neither party disputes - "[t]hat phrase was never uttered by any sworn witness during the arbitration hearing." Final Award, at 11.

ACHA argues that because 18 of the 26 change orders related directly to the design of the building, the damages could only have been attributable to the architect. ACHA faults the Panel for not putting in the effort to calculate the damages. ACHA also cites to the architectural report (with no witness to testify about it) that was put into evidence. Although the ACHA cross-examined Caridi about the opinion in the report, the Panel found that "this certainly did not result in ACHA meeting its burden of proof." Final Award, at 11.

It is not this Court's role to second-guess the factual or legal findings of the arbitrators. See Major League Umpires Ass'n, 357 F.3d at 279 ("Our role in reviewing the outcome of the arbitration proceedings is not to correct factual or legal errors made by an arbitrator"). Indeed, even if this Court were to find that the arbitrators made a serious fact-finding error,

24

that would not be enough to overturn the Award.  See <u>MLBPA v.</u>
<u>Garvey</u>, 532 U.S. 504, 509 (2001)("When an arbitrator resolves
disputes regarding the application of a contract, and no
dishonesty is alleged, the arbitrator's 'improvident, even
silly, factfinding' does not provide a basis for a reviewing
court to refuse to enforce the award")(internal citations
omitted).

## B. **"Evident Partiality"**

Next, ACHA argues that the Final Award should be vacated
because of "evident partiality" on the part of the arbitrators.
Although ACHA argues that the Panel's decision showed "profound
bias in favor of SRC," the Court has reviewed the record and
finds no evidence of bias on the part of the Panel.  In fact,
the Panel made findings in favor of ACHA. Specifically, the
Court rejected numerous delay claims asserted by SRC, including
substantial claims in the amounts of $1,116,038.51 and
$585,061.41. These rulings in favor of ACHA on significant
claims by SRC extirpate ACHA's firmly held assertion that the
Panel demonstrated "profound bias."

ACHA challenges the Panel's factfinding and contractual
interpretation, but the Court discerns no evidence of partiality
or bias in the Panel's ultimate decision. For the reasons set
forth above, the Court has found that the Panel applied the

terms of the Contract within the scope of the authority accorded to it by the parties' agreement to arbitrate.

## V.   __SRC's MOTION FOR SANCTIONS__

SRC seeks an order from this Court granting sanctions against ACHA and its law firm, Parker McCay P.A., pursuant to Fed. R. Civ. P. 11 and 28 U.S.C. § 1927 [Dkt. No. 220]. In doing so, SRC characterizes ACHA's Motion to Vacate the Arbitration Award as a "full scale attack on the integrity of the arbitrators without any objective evidence."  Motion for Sanctions, at 2.

In evaluating whether sanctions are warranted, the Court must determine whether the party's conduct was "objectively reasonable under the circumstances." Simmerman v. Corino, 27 F.3d 58, 62 (3d Cir. 1994). Sanctions are to be applied only "in the 'exceptional circumstance' where a claim or motion is patently unmeritorious or frivolous." Doering v. Union County Bd. of Chosen Freeholders, 857 F.2d 191, 194 (3d Cir. 1988) (citation omitted). Rule 11 "must not be used as an automatic penalty against an attorney or party advocating the losing side of a dispute," and it "should not be applied to adventuresome, though responsible, lawyering which advocates creative legal theories." Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 94 (3d Cir. 1988)(internal citation omitted).

The Court is keenly aware of the animosity between the parties. What started out as a two-year contract between the parties dragged on for eight years, only to be followed by eight more years of acrimonious litigation, countless trips to Court, and a contentious arbitration proceeding. The parties' frustrations with each other and the litigation process are readily apparent in the tone of the briefs.

In a case already marred by the parties' hostile and unfortunate conduct towards each other, this Court cannot find that ACHA's Motion to Vacate the Arbitration Award was "objectively unreasonable" under the circumstances. While ACHA vigorously disputes the Panel's findings, which this Court has upheld, it cannot be said with any firm conviction that ACHA's motion was "patently unmeritorious or frivolous." Both parties have challenged nearly every ruling of this Court and the Panel. In that context, the Court does not find that ACHA's motion is any more or less groundless than previous actions taken by both parties. ACHA is clearly disappointed and appears to genuinely disagree with factual and legal findings in the Final Award. Given all the totality of the circumstances in this case, the Court will not sanction ACHA for exercising its legal right to challenge the arbitration award. Therefore, the court denies SRC's motion.

## VI.  CONCLUSIONS

For the foregoing reasons, ACHA's Motion to Vacate the Final Arbitration Award [Dkt. No. 209] and SRC's Motion for Sanctions [Dkt. No. 220] will be **DENIED**.  Additionally, because there is not currently an appeal pending in this matter, SRC's Bond Motion [Dkt. No. 214] will be **DENIED** as not ripe.  A corresponding Order shall issue on this date.


Dated: March 18, 2019

s/Renée Marie Bumb
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE